**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-0694-WJM-NYW

DANIEL TONELLO,

     Plaintiff,

v.

CITY OF GRAND JUNCTION, COLORADO,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

In this employment discrimination action, Plaintiff Daniel Tonello sues Defendant City of Grand Junction, Colorado (the "City"), alleging that the City discriminated against him on account of his age, created a hostile work environment, failed to comply with the City's policies and procedures, and violated his procedural due process.  (¶¶ 43–117.)[1]

Before the Court is the City's Motion for Summary Judgment ("Motion"), filed on January 14, 2020.  (ECF No. 25.)  For the reasons explained below, the Motion is granted.

## I.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.*

---

[1] Citations to paragraph numbers, without more, *e.g.* (¶__), are to paragraphs in Tonello's Amended Complaint and Jury Demand ("Amended Complaint").  (ECF No. 8.)

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND[2]

Tonello began working for the City as a pipefitter in 1980 and began working at the Persigo wastewater treatment plant in 1984.  (ECF No. 25 ¶ 1; ECF No. 32 at 4, ¶ 1.)  From 2004 to December 2018, Tonello worked as the City's wastewater services manager.  (ECF No. 25 ¶ 2.)  A majority of his job responsibilities focused on the wastewater treatment plant and its operation and management.  (*Id.* ¶ 9.)

---

[2]  The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

During his tenure, Tonello received numerous positive performance reviews and accolades from his co-workers and supervisors.  (ECF No. 32 at 17,  ¶ 2; ECF No. 32-18; ECF No. 32-21.)

**A.     The City's Policy Manual**

The City maintains a Personnel Policy Manual (the "Policy Manual"), which defines the general conditions of employment for all full-time City workers.  (ECF No. 25-3 at 11.)  The Introduction section of the Policy Manual includes the following statement:

> **DISCLAIMERS**: The Manual is provided for informational purposes only.  No provision, term or portion of the Manual constitutes an implied or expressed contract, guarantee or assurance of employment or a right to an employment related benefit, process or procedure. . . . The City reserves the right to change, modify, eliminate or deviate from any policy, procedure, process or program in the Manual or otherwise at any time.

(*Id.*)  On May 16, 2002, Tonello signed a statement acknowledging that

> [t]his handbook and the policies and procedures contained herein and/or any verbal statements made by management do not constitute a contract of employment, either expressed or implied, nor do they guarantee employment for a specific duration.  I acknowledge that this handbook is neither a contract of employment nor does it create contract rights.

(ECF No. 25-5.)

1.     <u>Policies Regarding Harassment and Discrimination</u>

The Policy Manual includes various policies affirming the City's commitment to providing a workplace free of discrimination or harassment:

•     **EQUAL EMPLOYMENT OPPORTUNITY**: The City . . . will provide equal employment opportunity for all qualified applicants and employees consistent with the requirements

3

of state and federal law.  Accordingly, discrimination against any person or employee because of . . . age (40 or older) . . . or any other status protected by applicable state or local law is not allowed.

- **HARASSMENT OR INTIMIDATION**: No City employee will harass or intimidate any other person or class of people on the basis of . . . age (40 or older) . . . or any other status protected by applicable state or local law.

- **HOSTILE WORK ENVIRONMENT**: A hostile work environment is an unlawful or unacceptable form(s) of conduct which undermines the integrity of the employment relationship.  A hostile work environment will not be tolerated whether such harassment is directed towards fellow employees or the public.

- **RESPONSIBILITY**: An employee who feels victimized by harassment should inform the individual engaging in harassing behavior that such behavior is unwelcome, then report each instance of alleged misconduct to the appropriate supervisor, department director or Human Resources Director.  An investigation will be conducted and any employee found to have harassed any person will be subject to appropriate discipline, up to and including dismissal.  The outcome of the investigation and that appropriate discipline was taken, if any, will be reported to the complainant and the employee accused.  Any employee who retaliates against another for filing a harassment complaint will be subject to discipline, up to and including dismissal.  Supervisors and department directors must take preventative and timely action with regard to harassment. All incidents must be documented.

(ECF No. 25-3; ECF No. 32-4 at 1; ECF No. 32-6 at 1–2.)

The Policy Manual also establishes formal and informal grievance procedures to resolve employee complaints.  Under the Formal Grievance Procedure, an employee filing a grievance against his department director must submit a written grievance on the City's Employee Grievance Form to the Human Resources ("HR") Director.  (ECF No. 32-7 at 2.)  The HR Director will meet with the employee within five days of

4

receiving the grievance.  (*Id.*)  Thereafter, the HR Director will conduct an investigation and provide a written response to the employee within ten days of the meeting.

If the employee is unsatisfied with the response from HR Director, the employee may appeal the decision in writing to the City Manager, who will review the decision and respond to the employee within ten working days.  (*Id.*)

2.      The City's Employee Recognition Program

The Policy Manual also outlines the City's Employee Recognition Program, which awards compensation to employees who suggest cost saving ideas.  (ECF No. 25 ¶ 10; ECF No. 32-5 at 2.)  To receive recognition under the program, (1) an employee must submit the cost saving suggestion in writing to his or her supervisor and HR; and (2) the suggestion should be original and beyond the scope of the employee's regular job duties.  (ECF No. 25 ¶¶ 11–12; ECF No. 32-5 at 2.)  Whether to issue an award is within the City's discretion.  (ECF No. 25 ¶ 12.)

Tonello claims that he submitted a cost saving form to his then-supervisor, Greg Lanning, in 2017.  (*Id.* ¶ 13.)  Tonello claims that he wanted compensation through the recognition program for a cost saving idea for the Persigo wastewater plant.  (*Id.* ¶ 15.) According to Tonello, Lanning did not respond to his claim.  (*Id.* ¶ 13.)

Although Tonello did not receive recognition for his 2017 cost saving suggestion, he received various other awards during his employment with the City, some of which were accompanied by additional compensation.  (*Id.* ¶ 16; ECF No. 25-8.)

**B.     The City Hires a New Utilities Director**

From August 2017 to December 2017, Tonello worked as the interim Utilities Director for the City.[3]  (*Id.* ¶ 17.)  During that time, he applied for the permanent Utilities Director position.  (*Id.* ¶ 18.)

The City completed an extensive hiring process for the permanent position, conducting interviews of numerous candidates and utilizing two separate hiring panels.  (*Id.* ¶ 19.)  The City ultimately hired Randi Kim as the permanent Utilities Director.  Kim is a woman who is six years younger than Tonello.  (*Id.* ¶¶ 19–20; ECF No. 32 at 17, ¶ 4.)  Tonello returned to his position as Wastewater Services Manager with Kim as his direct supervisor.  (ECF No. 25 ¶ 21.)

**C.     Tonello's Relationship with Kim**

In March 2018, Tonello sought advice from then-HR Director Claudia Hazelhurst regarding his dissatisfaction with the way Kim was treating him.  (*Id.* ¶ 24.)  He did not, however, inform Hazelhurst that he believed his age was the reason for Kim's treatment of him.  (*Id.* ¶ 26.)

At Hazelhurst's suggestion, Tonello spoke with Kim on April 20, 2018.  (*Id.* ¶ 27; ECF No. 25-2 at 3.)  During that conversation, Kim told Tonello that "[she] had been short and abrupt with [him], and admitted that [she] had done so in the past with others and that it was something that [she] is working on."  (ECF No. 25-2 at 4.)

---

[3]  The City's Motion states that Tonello filled in as the interim Utilities Director for the City from August 2018 to December 2018.  (ECF No. 25 ¶ 17.)  It appears that this actually occurred in 2017 because Randi Kim was hired in December 2017.  (*See, e.g.*, ECF No. 32-2 at 1; ECF No. 32-3 at 1.)

On June 7, 2018, Tonello e-mailed Hazelhurst a document entitled "Complaint of

'Hostile Working Environment'" ("Complaint").  (ECF No. 25 ¶ 36; ECF No. 25-23; ECF

No. 32-1.)  In his Complaint, Tonello states that he "no longer feel[s] valued or even

respected by [his] supervisor" and feels as though he has "lost significant credibility and

to a degree the respect of [his] peers and subordinates."  (ECF No. 25-23 at 1; ECF No.

32-1 at 2.)  He states that Kim "has created an environment in which [Tonello] feel[s]

almost unable to perform the duties associated with [his] position, and find[s] [himself]

just hoping that each day will end without another incident occurring."  (ECF No. 25;

ECF No. 25-23 at 1; ECF No. 32-1 at 2.)  He cites nine examples which he believes

demonstrate "how [he] ha[s] been singled out and treated unprofessionally and

unfairly":

(1)   <u>February 5, 2018</u>: After a Persigo employee filed a hostile
work environment complaint against Tonello and another
employee, Tonello called Kim to share information with her
regarding the employee in question.  Kim told him, "I don't
want to discuss any of this with you until the process has run
its course, at that point I will make my decision, and only
then."

(2)   <u>February 7, 2018</u>: Kim informed Tonello that she was
leaning towards overruling a decision that he had made
regarding an employee's secondary employment request.
Tonello was bothered by her decision to make a
recommendation after she only heard half of the story; he
told Kim that he felt like the employee was playing her.  In
response, she yelled, "How do I know YOU are not trying to
play me because I refused your secondary employment
request."  Afterwards, Kim apologized for her response.

(3)   <u>March 6, 2018</u>: Tonello shared an idea during a
management meeting, to which Kim responded, "What are
we a bank?"  Tonello considered this comment to be
"extremely rude and humiliating as [he] was only trying to
help solve a problem." After Tonello shared additional ideas,

7

Kim "became angry, dismissive, and rude because of [his] comments."

(4)     March 20, 2018: During a group conversation, Tonello disagreed with a suggestion of having a ropes course at an upcoming retreat because many people in the group were above the age of fifty.  He told Kim he did not think it was a good idea.  However, before Tonello could explain his answer, Kim "tilted her head to one side, raised her lip and shook her head," "dismiss[ing] [him] with her disgusted look and changed the subject."  Tonello states that he was humiliated and did not to say anything else.

(5)     March 27, 2018: During a bi-weekly meeting, Tonello made a comment about how the City had to rely on a third party's word that a disposal function had occurred.  Kim interrupted Tonello, asking, "Why wouldn't the paper trail work in this case? What are they going to do, falsify documents?"  After Tonello explained his comment, Kim interrupted him again, asking, "What, do we consider everyone to be a criminal?"  Tonello states that he was humiliated by Kim's comments.

(6)     April 17, 2018: During a retreat, Kim asked another employee a question that was outside of that employee's scope of responsibilities.  Tonello answered the question.  In response, Kim said, "If I can finish with my question, Jay what do you think?"  Tonello states that Kim's response was humiliating and embarrassing.

(7)     April 27, 2018: During a tour of a different wastewater treatment facility, Kim made a comment about Tonello being an "old man and will be retiring soon."  In response, a different employee responded, "No not Dan, he'll be here for another 4 or 5 years."  Tonello states that Kim's comment was embarrassing.

(8)     May 15, 2018: During a management meeting, Tonello wanted to voice his opinion and stated, "I don't mean to disagree but. . . ."  Kim interrupted Tonello.  She said, "Yes you do."  Tonello state that he felt very uncomfortable and embarrassed during the remainder of the meeting.

(9)     May 31, 2018: After Tonello had asked for a day off to go fishing, Kim asked him whether he was going fishing alone, whether his wife ever goes with him, and whether Kim would

>ever receive an invitation to go fishing with him.  Tonello
>considered these questions to be inappropriate.

(ECF No. 25-23 at 1–5; ECF No. 32-1 at 2–6.)

On June 13, 2018, Hazelhurst and John Shaver, a City attorney, spoke with Tonello about his Complaint and about how it might be perceived in light of the fact that Tonello had competed for the job ultimately awarded to Kim.  (ECF No. 25 ¶ 46.)  The City did not conduct a formal investigation into the Complaint.  (ECF No. 32-11 at 36.)

## D.    Tonello's Retirement

On July 24, 2018, Tonello submitted written notice to the City of his intent to retire on December 15, 2018.  (ECF No. 25 ¶ 53.)  His July 24, 2018 letter does not state that Tonello believed that he was forced to retire or was the subject of discrimination or harassment.  (*Id.* ¶ 56.)  When Tonello spoke to the City Manager prior to his last day of work, he did not raise his concerns regarding Kim's conduct.  (*Id.* ¶ 59.)

After Tonello's retirement, his position was filled by Kurt Carson, a registered professional engineer with a master's degree.  (*Id.* ¶ 62; ECF No. 32 ¶ 17.)  Carson is approximately 30 years younger than Tonello and is paid less money.  (ECF No. 32 at 29, ¶ 17.)

## E.    The Instant Lawsuit

Tonello filed this discrimination lawsuit against the City on March 7, 2019 (ECF No. 1) and filed the Amended Complaint on March 28, 2019 (ECF No. 8).  He alleges that: the City discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA") and the Colorado

Anti-Discrimination Act, Colo. Rev. Stat. §§ 24-24-401 *et seq.* ("CADA") (¶¶ 43–51, 61–68); the City subjected him to a hostile work environment in violation of the ADEA and CADA (¶¶ 52–60, ¶¶ 69–77); the City breached the implied employment contract created by the Policy Manual and should be promissorily estopped because it failed to investigate employee complaints and failed to provide Tonello recognition for his cost saving suggestion (¶¶ 78–90, ¶¶ 91–101); and the City violated Tonello's procedural due process (¶¶ 102–117).

The City filed its Motion on January 14, 2020. (ECF No. 25.) Tonello responded on March 10, 2020 (ECF No. 32), and the City replied on March 23, 2020 (ECF No. 33).

## III.  ANALYSIS

### A.    Age Discrimination Claims

Tonello brings claims under the ADEA and CADA for age discrimination, alleging that his age was the driving factor behind Kim and the City's purportedly discriminatory conduct toward him and that he was "constructively discharged after months of humiliating conduct perpetrated by his supervisor . . . with [the City's] knowledge, acquiescence, and even approval." (¶¶43–51, 61–68.)

### 1.    Applicable Law – ADEA[4]

The ADEA prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

---

[4] Because the CADA and ADEA utilize the same legal standards, the Court's reasoning applies in equal force to Tonello's federal and state claims of age discrimination and hostile work environment. *See Fuller v. Seagate Tech., LLC*, 651 F. Supp. 2d 1233, 1242 (D. Colo. 2009) (recognizing that courts "appl[y] the same legal standard to both the state [CADA] and federal [ADEA] claims").

such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA protects workers "who are at least 40 years of age."  29 U.S.C. § 631(a).

In evaluating an ADEA claim, the Tenth Circuit applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]  Under that framework, a *prima facie* claim for job termination based on age discrimination under the ADEA, a plaintiff must show that: (1) he is a member of the class protected by the [ADEA]; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others not in the protected class.  *Jones*, 617 F.3d at 1279.  A plaintiff must also "prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross*, 557 U.S. at 176.  While a plaintiff need not allege that his age was the sole motivating factor for his adverse employment action, he must allege that "age was the factor that made a difference."  *Jones*, 617 F.3d at 1277.

If the plaintiff satisfies his initial burden, the defendant must then provide a legitimate, nondiscriminatory reason for the adverse employment action, upon which the burden shifts back to the plaintiff to show the proffered reason is pretext for unlawful discrimination.  *Id.* at 1278.  However, "[w]hen a plaintiff offers direct evidence of discrimination . . . [his] claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas.*"  *Tabor v. Hilti, Inc.*, 703

---

[5] In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Supreme Court expressly left open the question of "whether the evidentiary framework of [*McDonnell Douglas*] . . . is appropriate in the ADEA context."  557 U.S. at 175 n.2.  However, the Tenth Circuit has since reaffirmed use of the *McDonnell Douglas* framework in ADEA cases.  *Jones  v. Okla. City Public Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) ("[W]e conclude that [*Gross*] does not preclude our continued application of *McDonnell Douglas* to ADEA claims."); *Seastrand v. U.S. Bank N.A.*, 807 F. App'x 882, 888 (10th Cir. Apr. 20, 2020) (same).

F.3d 1206, 1216 (10th Cir. 2013).

      2.    <u>Whether Tonello Suffered an Adverse Employment Action</u>

A constructive discharge may constitute an adverse employment action under the ADEA. *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 467 (10th Cir. 1990). "To establish a prima facie case of age discrimination by constructive discharge, an employee must prove that his 'employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Id.* (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986)); *see Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 662 (10th Cir. 2004) ("If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."). "Essentially, a plaintiff must show that []he had *no other choice* but to quit." *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (emphasis in original). The conditions of employment must be objectively intolerable; a plaintiff's "subjective views of the situation are irrelevant." *Id.*; *Exum v. U.S. Olympic Comm'n*, 389 F.3d 1130, 1135 (10th Cir. 2004) ("The question is not whether working conditions . . . were difficult or unpleasant," but rather whether the plaintiff's decision to resign can properly be characterized as involuntary.).

The City argues that Tonello has failed to establish a *prima facie* case of age discrimination because he "cannot demonstrate that his voluntary resignation and retirement amounts to a constructive discharge." (ECF No. 25 at 14.) Tonello contends that the City created intolerable working conditions that would cause a reasonable person to feel compelled to resign by: (1) allowing, if not condoning, Kim's hostile and

discriminatory conduct to continue unrestrained; (2) refusing to investigate Tonello's formal 'Complaint for Hostile Work Environment;' and (3) refusing to evaluate his requests for recognition related to the natural gas program he implemented at Persigo. (ECF No. 32 at 22.)

Tonello's Complaint suggests that Tonello was scolded for relatively minor slights, but these slights are insufficient to show that Tonello was constructively discharged. *See Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (recognizing that federal law "does not guarantee a utopian workplace, or even a pleasant one" and that "[p]ersonality conflicts between employees are not the business of federal courts" (quoting *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994))). Tonello was never subject to a reduction of salary or benefits, was never demoted or received a different title, and was never formally disciplined for any reason. (ECF No. 25 ¶ 35.) *See DeWalt v. Meredith Corp.*, 288 F. App'x 484, 494 (10th Cir. 2008) (finding no constructive discharge where plaintiff was not threatened with termination or discipline despite receiving verbal and written remands). Instead, he can point to only nine instances in which he felt slighted by Kim, only one of which was an explicit comment regarding his age and potential retirement.[6] These comments, although unpleasant, cannot be characterized as objectively intolerable.[7] *See Lara v.*

---

[6] Tonello spoke with Kim about her conduct on April 20, 2018. (ECF No. 25 ¶ 27; ECF No. 25-2 at 3). Only three of the nine comments occurred after this conversation.

[7] The City's handling of Tonello's Complaint does not make his working conditions objectively intolerable either. The Complaint does not explicitly state that Tonello believed that he was being discriminated against or subjected to a hostile work environment based on his age. (ECF No. 25-23; ECF No. 32-1.) Aside from his own conclusory speculation, Tonello has not provided any evidence suggesting that Shaver and Hazelhurst did not launch a full-scale investigation based on age-related animus or in an effort to get rid of older employees. At any

*Unified Sch. Dist. #£501*, 350 F. App'x 280, 284 (10th Cir. 2009) (comments about plaintiff's health and early retirement options were isolated and cannot reasonably be characterized as harassing or intolerable).

The City's failure to evaluate Tonello's requests for recognition related to his cost savings idea also does not render his working conditions to be intolerable.  Tonello has not provided specific evidence that would enable the Court to evaluate his claim that he was actually entitled to recognition under the program.  For example, he has not provided competent evidence that he submitted the form to his supervisor and HR before the suggestion was implemented, or evidence that would allow a reasonable fact finder to conclude that his suggestion was beyond the scope of his employment.  (ECF No. 32-5 at 2.)  At any rate, the Court finds that the failure to be awarded a *discretionary* award would not cause a reasonable person in Tonello's position to feel compelled to resign.[8]

---

rate, Tonello was entitled to raise his complaints to the City Manager and chose not to do so. (ECF No. 25 ¶¶ 58–59.)  *See Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992) (finding no constructive discharge where plaintiff failed to take steps short of resignation to make working conditions more tolerable); *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995) ("Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast.  An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." (internal citations omitted)).

[8]  The Court notes Tonello asserts that he submitted the recognition form in 2017.  (ECF No. 32-1 at 46–47.)  Even assuming that Tonello felt subjectively slighted by the City's failure to investigate his request for recognition, the pressure could not have been so great to force him to quit because Tonello waited at least another year to leave.  *See Martinez v. Southwest Cheese Co., LLC*, 618 F. App'x 349, 354 (10th Cir. 2015) (recognizing pressure on plaintiff "could not have been so great to force her to quit because she did not resign for another two-and-a-half years").

Moreover, Tonello's subjective statements about his intolerable work conditions are contradicted by the fact that he continued to work for the City for nearly five months after he submitted notice of his intent to retire.  (ECF No. 25 ¶ 55.)  *See Ulibarri v. State of N.M. Corr. Acad.*, 31 P.3d 43, 49 (N.M. 2006) (no constructive discharge where plaintiff waited five months to resign).  Even as late in the day as his July 24, 2018 retirement letter, Tonello *still* did not express any contention that he was forced to retire or that he was the subject of discrimination or harassment—on the basis of his age or otherwise.  (ECF No. 25 ¶ 56.)  Nor did he inform the City Manager about his concerns despite being given an opportunity to do so.  (*Id.* ¶ 59.)

Significantly, Tonello has admitted that his working conditions *substantially improved* after he submitted notice of his intent to retire.  During his deposition, Tonello characterized the period between July 24 and December 15, 2018 as a "wonderful time" where he "was built up in every possible opportunity" and was told "how horrible it was going to be to lose [him]."  (ECF No. 25-1 at 57.)  Despite the admitted improvement in working conditions, Tonello never asked to rescind his retirement.[9]  (ECF No. 25 ¶ 60;

---

[9]  Numerous City employees submitted declarations stating that Tonello had told them that his decision to retire was impacted by the City's prospective changes to his retirement benefits.  (*See* ECF No. 25-14 ("[Tonello] indicated that the City's intended change for 2019 associated with the retiree health benefits was a consideration for his retirement in 2018."); ECF No. 25-15 ("Well before Ms. Kim's hiring, I recall Mr. Tonello stating that he was intending to retire . . . When Mr. Tonello and I would discuss his retirement plans the fact that the City was changing its retirement benefits in 2019 was an issue that we discussed."); ECF No. 25-20 ("[Tonello] advised me that the driving reason for his retirement in 2018 was to retire before [the] City's retiree benefits changed in 2019.").)

Tonello himself admits that the financial benefit of retiring in 2018 was one of his considerations.  (ECF No. 32-9 at 74 ("[S]o the decision I had to make is do I retire in 2018 at a lower percentage cost out of my pocket for the health insurance or do I stick around and pay a higher percentage to gain a wage in 2019 in April when I turned 62.  At that point I decided to go in 2018 because I thought it was beneficial to me to save that couple percent over the three-year period.").)  Even if Tonello's retirement decision was largely motivated by a desire to get

ECF No. 25-1 at 58.)

After considering the totality of the evidence, the Court finds that no reasonable trier of fact could conclude that Tonello's working conditions were so difficult that a reasonable person in his position would feel compelled to resign.  Accordingly, Tonello has failed to establish any genuine issue as to whether he was in fact constructively discharged.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

3.   Causation

Even if Tonello could establish that he was constructively discharged—a dubious assumption in light of the clear weight of evidence to the contrary—he has failed to provide evidence from which a reasonable factfinder could determine that his "age was the factor that made a difference."  *Jones*, 617 F.3d at 1277–78.  "In order to rely on age related statements, [plaintiff] must show that they were made by a decision maker, and that there was a nexus between the discriminatory statements and the decision to terminate."  *Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1197 (10th Cir. 2010).

Tonello has only pointed to a single explicit age-related comment made by Kim during his tenure.  (ECF No 25-23 at 4 ("Kim made a comment about me being an 'old man and will be retiring soon.'").)  Otherwise, he merely speculates that the City's actions and Kim's other slights were connected to age-based animus.  (*See, e.g.*, ECF

---

away from Kim, his internal calculus about *when* he should retire is wholly inconsistent with a person who was compelled to resign in an involuntary fashion.

No. 25-1 at 44 ("Q: What specific conduct do you contend [Shaver] took because of your age? A: Not choosing to follow through with my complaint of a hostile work environment, and I believe that was based on a directive overall encompassing to get rid of the older people."); *id.* at 25 ("[I]t was a series of issues, that I became aware that this is a continuing pattern that is harassment, and later learning that it was, in my opinion, discrimination based on my age."); *id.* at 45–46 ("I believe an inconsistency with the application of how these complaints would be reviewed, it was just totally different.  In my situation, . . . I believe that was based on my age and their overall encompassing wanting a younger workforce.); *id.* at 72 ("Every one of these incidents occurring from February 5th through May 31st, in my opinion, were related to age discrimination.").)

Taken together, Kim's comments and Tonello's speculation about the City's goal of getting rid of older employees are wholly insufficient to establish *facts* from which a reasonable factfinder could determine that the City constructively discharged Tonello *because* of his age.  *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1182 (10th Cir. 2007) (McConnell, J. concurring) ("Rudeness does not, standing alone, demonstrate discrimination."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000) ("stray remarks" are insufficient to create an inference of age discrimination); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("[U]nless [plaintiff] can connect [his superior's] dislike to his age, there is no genuine issue of material fact regarding age or age based

17

discrimination").

Accordingly, for the reasons stated above, the Court grants the City's Motion as to Tonello's age discrimination claims.

**B.     Hostile Work Environment Claims**

Tonello contends that the City created and allowed a hostile work environment, which forced Tonello toward his constructive discharge.  (¶¶ 52–60, ¶¶ 69–77.)

To prove a hostile work environment claim under the ADEA and CADA, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment."  *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005).  The totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interfered with an employee's work performance.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  A plaintiff must show that the workplace was both objectively and subjectively hostile or abusive.  *Id.* at 21–22.  Importantly, a plaintiff must also show that the alleged harassment stemmed from age-based animus; general harassment not based on a protected class is not actionable.  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

The City argues that Tonello has failed to establish a *prima facie* case of hostile work environment.  (ECF No. 25 at 21–22.)  Specifically, it argues that the evidence is "not objectively severe or pervasive" to create a hostile work environment.  (*Id.*)  The Court agrees.

18

Tonello has only cited a handful of Kim's comments that he alleges constitutes harassment, and only one of the comments explicitly related to his age.  (ECF No. 25-23.)  Even taking all of these comments as true, they fall far short of the severity or pervasiveness of hostile comments required for a successful hostile work environment claim.  *DeWalt*, 288 F. App'x at 495–96 (holding "several ageist comments made by [employer's] management" and "nitpicking" the work of older employees was not sufficient to survive summary judgment); *Homes v. Regents of Univ. of Colo.*, 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (finding plaintiff's claims "of overhearing conversations regarding the possibility of her imminent retirement" is "hardly the type of age-discriminatory conduct that meets the threshold requirements for surviving summary judgment").  This deficiency alone is sufficient to warrant dismissal of his hostile work environment claims.

The Court recognizes that Tonello was probably unhappy with his job and his relationship with his supervisor.  However, the federal employment laws "are not intended to remedy every instance of interpersonal conflict occurring in the workplace—only those motivated by improper discriminatory purposes."  *Homes*, 1999 WL 285826, at *8.  As explained in Part III.A.3, Tonello has also failed to provide sufficient evidence from which a reasonable finder of fact could conclude that the alleged harassment stemmed from age-related animus.  *Bolden*, 43 F.3d at 551; *see Chytka v. Wright Tree Serv., Inc.* 925 F. Supp. 2d 1147, 1168–69 (D. Colo. 2013) (finding hostile work environment claim falls "far short" of demonstrating pervasive or severe workplace harassment where only one comment relates to plaintiff's gender and only one comment relates to her age over her long employment with defendant).

19

For the reasons explained above, the Court concludes that Tonello has not demonstrated that there is a genuine issue of material fact in connection with his hostile work environment claims.  Accordingly, the Court grants the City's Motion as to these claims.

**C.      Breach of Implied Employment Contract**

Tonello alleges that the Policy Manual—which contains policies regarding investigation of harassment, discrimination, and hostile work environments, as well as policies regarding employee recognition for cost saving suggestions—created an implied contract of employment between the City and Tonello, which the City breached by not investigating Tonello's claims.  (¶¶ 78–90.)  The City has moved for summary judgment on this claim, arguing that Tonello has failed to provide *prima facie* evidence that the parties had an implied contract.  (ECF No. 25 at 24.)

To show the existence of an implied employment contract, an employee must show that, in promulgating a written employment manual or policy or making a similar oral policy statement, the employer was making an offer to the employee.  *Kroekel v. U.S. Marshals Serv.*, 1999 WL 33919792, at *13 (D. Colo. May 21, 1999).  In other words, the employee must first show that through the employer's statements "the employer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to the bargain was invited by the employer and that the employee's assent would conclude the bargain."  *Cont'l Air Lines v. Keenan*, 731 P.2d 708, 711 (Colo. 1987) (en banc) (citing Restatement (Second) of Contracts § 24 (1981)).  The employee must also show "that his initial or continued employment constituted acceptance and consideration for those procedures."  *Id.*

20

Even if an employer has made certain statements in employee handbooks, "an employer is entitled to summary judgment" on an implied contract claim "'if the employer has clearly and conspicuously disclaimed intent to enter into a contract." *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1190 (D. Colo. 2016) (quoting *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997)); *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 248 (Colo. App. 2006) ("Termination procedures set forth in an employee manual or handbook do not create an implied contract where a clear disclaimer of any contractual rights appears.").  Whether a contract disclaimer is "clear and conspicuous" is a question of law for the Court.  *Id.*

The Policy Manual's Introduction contains a separate section under the boldface title DISCLAIMERS, which provides

> The Manual is provided for informational purposes only.  *No provision, term or portion of the Manual constitutes an implied or expressed contract*, *guarantee or assurance of employment or a right to an employment related benefit, process or procedure.* . . . The City reserves the right to change, modify, eliminate or deviate from any policy, procedure, process or program in the Manual or otherwise at any time.

(ECF No. 25-3 at 11, § IV (emphasis added).)  A substantially similar version of this disclaimer was included in each iteration of the Policy Manual in effect during Tonello's employment.  (ECF No. 25-4.)  Tonello acknowledged in writing that he had received a copy of the handbook and that

> [t]his handbook and the policies and procedures contained herein and/or any verbal statements made by management do not constitute a contract of employment, either express or implied, nor do they guarantee employment for a specific duration.  I acknowledge that this handbook is neither a contract of employment nor does it create contract rights.

21

(ECF No. 25-5.)

The Court finds that the Policy Manual includes a "clear and conspicuous" disclaimer that disclaims the City's intent to enter into a contract with Tonello. *See Jaynes*, 148 P.3d at 248 (finding disclaimer language to be clear and conspicuous and sufficient to advise plaintiff that "no principles or guidelines created an express or implied contract, especially in light of her admission to having read the [p]rinciples"); *Silchia v. MCI Telecomms. Corp.*, 942 F. Supp. 1369, 1375 (D. Colo. 1996) (disclaimer language is sufficiently conspicuous where it is set off in its own paragraph with the subject of the paragraph "Employment at Will" highlighted in bold and in upper case letters); *Ramirez v. The GEO Grp., Inc.*, 655 F. Supp. 2d 1170, 1187–88 (D. Colo. 2009) (finding disclaimer sufficiently clear and conspicuous where plaintiff did not contend that she did not have an opportunity to read the handbook and acknowledged being aware of at least certain handbook policies during her employment).

Accordingly, Tonello has failed to make out a *prima facie* claim that the Policy Manual created an implied contract of employment. The Court will also grant the City's Motion as to this claim.

**D.     Promissory Estoppel**

To support his promissory estoppel claim, Tonello alleges that the City should have reasonably expected that Tonello would have relied upon its promises in the Policy Manual, that Tonello did detrimentally rely on such promises, and that he suffered damages as a result of being constructively discharged from his employment. (¶¶ 91–101.)

"Promissory estoppel is a quasi-contractual clause of action that, under certain

circumstances, provides a remedy for a party who relied on a promise made by another party, even though the promise was not contained in an enforceable contract." *Pinnacol Assur. v. Hoff*, 375 P.3d 1214, 1220 (Colo. 2016).  As Tonello bears the burden of proving this common law exception to at-will employment to survive summary judgment, he must show a genuine dispute of fact as to each of the elements of his promissory estoppel claim.  *Jaynes*, 148 P.3d at 243 (recognizing that an at-will employee hired without an express contract "has the burden of pleading and proving" promissory estoppel).

To make out a *prima facie* claim of promissory estoppel, Tonello must establish: (1) the City made a promise to Tonello; (2) the City should have reasonably expected that the promise would induce action or forbearance by Tonello; (3) Tonello reasonably relied on the promise to his detriment; and (4) the promise must be enforced to prevent injustice.  *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006) (en banc). Where these elements are met, a promise becomes binding and may be enforced through the normal remedies under contract law.  *Pinnacol Assur.*, 375 P.3d at 1221.

With respect to the first element, the City contends that Tonello cannot show that it made a "promise" to him because the employment policies relied upon by Tonello were subject to a disclaimer that they did not create a contract and could be unilaterally altered by the City at any time.  (ECF No. 25 at 29–30.)   Within the context of policies and procedures, an employee may only rely on promissory estoppel where a "reasonable employee would construe the procedures as being binding on the employer" and "the procedures are sufficient definite to allow a court to understand and enforce them."  *Jaynes*, 148 P.3d at 247.

As explained in Part III.C, the Policy Manual contained a prominent disclaimer informing employees that it did not provide any guarantee or right to an "employment related benefit, process or procedure." The plain language of the disclaimer shows that the City did not intend that the Policy Manual would contain a promise to its employees and did not reasonably understand that its employees would rely on its policies. *See Geras v. Int'l Bus. Machs. Corp.*, 638 F.3d 1311, 1316 (10th Cir. 2011) (clear disclaimer in incentive plan shows that employer did not intend to be bound by its policies); *Therrien v. United Air Lines, Inc.*, 670 F. Supp. 1517, 1523 (D. Colo. 1987) ("I cannot see how an employee's claims of implied contract and promissory estoppel could ever be allowed to stand where that employee has signed a statement acknowledging his understanding that his employment was terminable at any time without cause.").

Because Tonello has failed to meet his *prima facie* burden with respect to essential elements of his promissory estoppel claim, the City's Motion is also granted as to this claim.

## E.   Procedural Due Process Claim

The Fourteenth Amendment's Due Process Clause, states, "No state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. A court must "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citation omitted); *see also Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007).

24

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (alterations in original).  To determine the procedural protections demanded by any particular situation, a court must consider three factors: (1) the interests of the individual in retaining their property and the injury threatened by the official action; (2) the risk of error through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the costs and administrative burden of the additional process, and the interest of the government in efficient adjudication.  *See id.* at 335.

Tonello contends that the implied contract created by the City's Personnel Policies "granted Mr. Tonello a property interest in his continued employment, not to have that employment terminated without procedural due process."  (¶ 108.)

Under Tenth Circuit law, "a property interest in the employment context consists of a legitimate expectation in continued employment." *Gonzalez v. City of Albuquerque*, 701 F.3d 1267, 1271 (10th Cir. 2012) (internal quotation marks omitted).  Because a property interest in continued public interest is not created by the Constitution, courts must determine whether such a property interest exists by looking at state law.  *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1221 (10th Cir. 2000); *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1128 (10th Cir. 2001).

An employee who is hired in Colorado for an indefinite period of time is an "at will employee" whose employment may be terminated by either party without cause and without notice.  *Cont'l Air Lines, Inc.*, 731 P.2d at 711.  "Absent some specific enactment to the contrary, an 'at-will' employee has no property right in continued

employment under Colorado law." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007). A property interest can arise from "express or implied contracts." *Id.* However, a "unilateral expectation" of continued public employment is not sufficient to create a property interest. *See Kingsford*, 247 F.3d at 1128.

Tonello admits that he was an "at will" employee. (ECF No. 25 ¶ 3.) He argues, however, that the Policy Manual created an implied contract, which, in turn, granted him a property interest in his continued employment. (ECF No. 32 at 32; ¶¶ 105–108.) As explained in Part III.C, however, the Policy Manual did not create an implied contract with Tonello. Tonello has therefore failed to establish that he was granted a property interest in his continued employment.[10] *See, e.g.*, *Holland v. Bd. of Cnty. Comm'rs of Cnty. of Douglas*, 883 P.2d 500, 506 (Colo. App. 1994) (recognizing in light of the disclaimer in employee handbook, "neither a property interest nor a contract right was created by the Handbook"); *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1259 (D. Colo. 2012), *aff'd* 550 F. App'x 596 (10th Cir. 2013) ("The mere existence of an employment manual with hearing and review procedures is not adequate grounds for a property interest in continued employment—particularly when . . . the Employee Manual explicitly and prominently disclaims contractual status and emphasizes that employees have at-will status."); *Romero v. Denver Pub. Sch. Dist. No. 1*, 2010 WL

---

[10] Moreover, Tonello's procedural due process fails to the extent he argues that he has a property interest in a thorough investigation of his Complaint or his cost saving suggestion. *See Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) ("[I]t is well established that an entitlement to nothing but procedure cannot be the basis for a property interest." (internal quotation marks omitted)); *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 991 (10th Cir. 1996) (recognizing that "[t]he university's promise that it would follow certain steps in considering the professors' reappointment did not beget a property interest in reappointment").

2943528, at *5, *9 (D. Colo. July 22, 2010) (concluding that procedures in an employee handbook did not create a property interest in employment in part because the manual prescribing the procedures contained a disclaimer conspicuously stating that "[t]he procedures do not change the at-will status of classified employees").

Even if Tonello had a property interest in his continued employment, the Court is unable to find *prima facie* evidence that the City interfered with, let alone deprived him of, his property interest. *See Ky. Dep't of Corr.*, 490 U.S. at 460 (recognizing procedural due process claims require that a liberty or property interest has been interfered with by the State). Because Tonello was not constructively discharged from his employment (*see* Part III.A.2), he cannot establish that the City has interfered with his purported property interest.[11]

Tonello has therefore failed to make out a *prima facie* claim of a procedural due process violation. The City's Motion is granted as to this claim.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that:

1.      The City's Motion for Summary Judgment (ECF No. 25) is GRANTED;

2.      The Clerk shall enter judgment in favor of the City and against Tonello and shall terminate this case; and

3.      The City shall have its costs, if any, upon compliance with

---

[11] The Court further notes that Tonello did not take advantage of the procedures available to him. For example, he did not seek to ask to escalate his Complaint to the City Manager. *See Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982) (recognizing that "a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them").

D.C.COLO.LCivR 54.1.

Dated this 28th day of September, 2020.

BY THE COURT:

William J. Martinez
United States District Judge